**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LUCY TALBOTT,

        Plaintiff,

      v.                                        Civ. No. 18-1102 SCY/LF

PUBLIC SERVICE COMPANY OF NEW
MEXICO, PNM RESOURCES, INC.,
REBECCA TEAGUE, Individually and in her
Official Capacity and JOANNE GARCIA,
Individually and in her Official Capacity,

        Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lucy Talbott is a former employee of Defendant Public Service Company of

New Mexico ("PNM"). At the time her employment ended, she was a manager of Customer

Service Revenue. Plaintiff contends that she should have been making as much as (or more than)

two other male managers at PNM and, because she was not, brings claims under the Equal Pay

Act, Title VII, and New Mexico state laws. She further contends that her campaign of many

years seeking equal pay ultimately led to adverse findings against her in connection with an

investigation into missing cash in her department. This then led to an administrative suspension

and, ultimately, her termination from employment. Defendants move for summary judgment on

all of Plaintiff's claims, contending that the pay disparity is appropriate because Plaintiff and the

two males were not performing equal work. Defendants argue that Plaintiff's job should not be

compared to the jobs of the two other male managers because they had different or greater job

responsibilities than Plaintiff. Further, Defendants justify Plaintiff's suspension and termination

by explaining that Plaintiff's manager determined that she inappropriately handled the missing-cash issue and did not display the professionalism expected of her position. Defendants also argue that Plaintiff's Title VII retaliation claim should fail because she did not exhaust administrative remedies by alleging wrongful termination in her EEOC complaint and that her equal pay claim is untimely. Finally, Defendants make various arguments related to Plaintiff's state law claims.

The Court grants the motion for summary judgment on Plaintiff's Equal Pay Act claim because Plaintiff has failed to develop facts that demonstrate her job was equal to those of the male comparators she identified. Further, Plaintiff failed to exhaust her administrative remedies with respect to her Title VII retaliation claim based on her termination. Moreover, even if she had exhausted her administrative remedies, she has not provided evidence that links her complaints of unequal pay to any adverse employment action. Plaintiff's Title VII wage discrimination claim similarly fails because PNM had an independent non-discriminatory reason for taking the actions about which she complains. The Court therefore grants summary judgment to Defendant PNM on all Plaintiff's federal claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.[1]

## I.    BACKGROUND[2]

### A.    Plaintiff's Employment at PNM

Plaintiff started working for Defendant in September of 1993. Doc. 38 at 6 ¶ 1; Doc. 46 at

---

[1] Because PNM is the sole Defendant with respect to Plaintiff's federal claims, and because the Court does not consider or analyze Plaintiff's state-law claims in this Memorandum Opinion, the Court will hereafter refer to PNM as the singular Defendant in this case.

[2] The facts are taken from the parties' summary judgment briefing and are undisputed except where noted. Where disputed based on the submission of admissible evidence, they are viewed in the light most favorable to Plaintiff.

2 ¶ 1. She was promoted to a manager in October of 2009. Doc. 46 at 5 ¶ 4. Her position was ineligible for senior management-level bonuses and incentives. *Id.* In 2010, Plaintiff began reporting to the director of customer service and marketing, Wayne Frye. Doc. 46 at 5 ¶ 6. In 2012, Plaintiff spoke to Mr. Frye about her compensation as a manager during a performance review, expressing her concern that, after she was promoted to management, Defendant started hiring managers into the same department at a higher salary grade than her for equal work. *Id.* Plaintiff specifically mentioned that she was concerned about the pay range of the positions held by two men, Mario Cervantes and Eric Morgan. Doc. 46-1 at 5 (Plf. Dep. at 25:14-20). Mr. Frye said he would look into Plaintiff's concerns, but nothing happened. Doc. 46 at 5 ¶ 7.

Later in 2012, Mike Rico became Plaintiff's supervisor. Doc. 46 at 5 ¶ 8. Plaintiff expressed her concerns to Mr. Rico that the two male managers had been given an accelerated grade and salary range for equal work. *Id.* Plaintiff additionally expressed frustration with the fact that her contributions to managing the department increased the incentive bonuses available only to her male colleagues. *Id.* at 6 ¶ 11. Defendant engaged in a formal compensation review of her position and declined to increase her position's classification or salary grade without explanation. *Id.* ¶ 9.

In early 2015, Plaintiff started reporting to Rebecca Teague, the Director of Customer Experience. Doc. 46 at 6 ¶ 13; Doc. 38-1 at 5 (Plf. Dep. at 31:1-9). When Ms. Teague became her supervisor, Plaintiff again expressed concerns that she was still classified two grades lower than her male colleagues. Doc. 46 at 6 ¶ 15. Ms. Teague agreed to look into the pay disparity, and in September 2015, PNM reclassified Plaintiff's position into a higher grade, with a salary increase. *Id.* However, Plaintiff was still being paid less than her male colleagues. *Id.* at 7 ¶ 16.

In early 2016, Plaintiff accidentally became aware of the specific salaries being paid to Mr. Morgan and Mr. Cervantes. *Id.* at 8 ¶ 29. At that time, Plaintiff again raised the issue of unequal pay with Ms. Teague, who refused to raise Plaintiff's salary to match that of Mr. Morgan or Mr. Cervantes. *Id.*

Prior to June 2016, Plaintiff consistently received positive performance evaluations, was considered by Ms. Teague to be a "good employee," and was never disciplined. *Id.* at 10 ¶ 40.

    B.    <u>Plaintiff's Work Compared To Her Male Colleagues</u>

In the fall of 2015, Plaintiff oversaw five departments involving revenue, billing, collections, and customer credit. Doc. 46 at 10 ¶ 18. She had two supervisors to assist with approximately thirty employees. *Id.* She had sole management responsibility for the credit and collections team, billing and exceptions, the Albuquerque payment center, "skip tracing"—a process of identifying dollars that were ready to be written off because they were left unpaid from a closed account—and "remittance reconciliation" for customer payments. *Id.* ¶ 19.

Eric Morgan was the manager of meter reading and managed the statewide meter reading group. Doc. 38 at 7 ¶ 3; Doc. 46 at 2 ¶ 3. He also managed or oversaw Defendant's rural payment centers (that is, every payment center that was not in Albuquerque) and some collections in the rural areas. Doc. 38 at 7 ¶ 3; Doc. 46 at 2 ¶ 3; Doc. 38-2 at 5 (Teague Dep. at 14:11-14). He had five or six supervisors located statewide who assisted him with approximately one hundred employees. Doc. 46 at 7 ¶ 20. He was receiving a higher salary than Plaintiff, despite being hired by Defendant in the same year. Doc. 46 at 2 ¶ 3; Doc. 47 at 1.

Mario Cervantes was the manager of Defendant's call center and responsible for everything related to the call center, including all the analytics and the supervisors who managed the actual contact center or call center representatives. Doc. 38 at 7 ¶ 4; Doc. 46 at 2 ¶ 4. He was responsible for the three to four supervisors who managed the call center employees. Doc. 46 at

7 ¶ 21. He also managed: (1) an analyst who managed call center scheduling and (2) an escalation desk where customer issues were escalated if they could not be resolved at the call center. Doc. 38 at 7 ¶ 4; Doc. 46 at 2 ¶ 4. Mr. Cervantes was hired as the call center manager in 2012 and immediately given a higher salary than Plaintiff as well as eligibility for senior level bonuses. Doc. 46 at 2 ¶ 4; Doc. 47 at 1.

Plaintiff never worked as the manager of Defendant's call center or as the manager of Defendant's meter readers. Doc. 38 at 7 ¶ 5; Doc. 46 at 2 ¶ 5. Plaintiff and Mr. Morgan shared responsibility for credit field collections, customer disconnects, and posting of cash payments, but in different geographic areas. Doc. 46 at 8 ¶ 23. And Plaintiff and Mr. Cervantes shared responsibility for following up with customers on delinquent accounts. *Id.* Plaintiff and her male colleagues were to be held equally accountable if something went wrong in the Customer Experience department. *Id.* ¶ 24.[3]

C.    The Missing Cash

When Plaintiff's management position was reclassified in late 2015, Defendant placed analyst Jim Marentes in her organization to implement controls and monitoring for the various avenues of revenue for which the organization was responsible. Doc. 46 at 8 ¶ 27. In early 2016, one of Plaintiff's employees, Annie Haskins, approached Plaintiff regarding a cash discrepancy for the month of February 2016 that Mr. Marentes discovered. *Id.* ¶ 30. Mr. Marentes found cash

---

[3] In a footnote in her response, Plaintiff gives the additional comparator of John Muscari. Doc. 46 at 2 n.1; Doc. 46 at 7 ¶ 22. In her deposition, however, Plaintiff admitted that Mr. Muscari "had much more experience within the company" and that she was "not comparing [her]self to him." Doc. 38-1 at 10 (Plf.'s Dep. at 67:17-22). She also admitted that Mr. Muscari's job did not involve the same "day-to-day activities" as her job. *Id.* at 11 (Plf.'s Dep. at 75:2-10). At the motion hearing, Plaintiff again acknowledged that Mr. Muscari is not a similarly situated comparator. Hearing Tr. at 29:19-21 & 30:25-31:2. In light of these admissions, the Court does not analyze Mr. Muscari as a comparator.

transactions that he could not verify were deposited in PNM's bank account: $1,815 on February 11 and $5,439 on February 18. Doc. 46-4 at 1. Plaintiff requested a meeting with her supervisor, Ms. Teague, to inform her of the cash discrepancy. Doc. 46 at 9 ¶ 31. Plaintiff proposed a plan of reconciling the current month of April before moving backwards to February. *Id.* Ms. Teague and Mr. Marentes agreed to this plan. *Id.*

Shortly thereafter, Ms. Teague had second thoughts about the plan and developed misgivings which she did not communicate to Plaintiff. Doc. 46-3 at 13 (Teague Dep. at 91:3-92:15). Instead, Ms. Teague spoke to JoAnn Garcia of Human Resources (HR) to request an internal audit of Plaintiff's organization. Doc. 46 at 9 ¶ 32. In June 2016, Ms. Garcia interviewed Dominique Trujillo, one of Plaintiff's employees, about her financial status and various debts, and accused Ms. Trujillo of taking the money alleged to be missing. *Id.* ¶ 33. After Ms. Trujillo came to Plaintiff in tears about this interview, Plaintiff told Ms. Teague that the investigation was being mismanaged by Ms. Garcia. *Id.* Ms. Teague told Plaintiff to go to HR with these complaints. *Id.* Plaintiff lodged a formal complaint with the director of HR against Ms. Garcia on June 8, 2016, expressing her concerns with Ms. Garcia's belligerent handling of the investigation. *Id.* ¶ 34.

On June 16, 2016, Mr. Marentes asked Plaintiff to go to coffee with him, and he expressed that he was uncomfortable about Ms. Garcia's investigation, and that he felt like he was being forced or led into a certain direction. Doc. 46-1 at 50 (Plf. Dep. at 110:9-19). He had asked Ms. Garcia not to talk to Ms. Trujillo and told her that he wanted more time to investigate. *Id.* (Plf. Dep. at 110:20-24).

An August 4, 2016 memorandum from Ms. Garcia that summarizes the results of her investigation concludes: (1) Plaintiff's direction to Mr. Marentes to stop his February review and

begin a review in April was "confounding," "suspect," and "failed to demonstrate sound

judgment expected of an employee in a management role"; (2) Plaintiff's questions to Mr.

Woodyard[4] would "trigger concern" and Plaintiff's comments during the investigation were

"suspicious"; and (3) Plaintiff was not truthful about her communications with Mr. Woodyard.

Doc. 46-4 at 2.

      D.     <u>Plaintiff's Placement On Paid Administrative Leave</u>

      On June 30, 2016, just after Mr. Morgan was given a promotion and Plaintiff had

complained to HR about Ms. Garcia's improper handling of the investigation, Plaintiff was

placed on paid administrative leave. Doc. 46 at 10 ¶ 36; Doc. 1 (Compl.) ¶ 47; Doc. 9 (Answer)

¶ 47. Plaintiff believes that she was placed on paid administrative leave because she complained

about Ms. Garcia's breaching confidentiality in an investigation and because of Plaintiff's

"persistence on the whole pay grade issue and the equal pay." Doc. 38 at 8 ¶ 9; Doc. 46 at 3 ¶ 9.

By contrast, Ms. Teague testified that she placed Plaintiff on paid administrative leave because

Plaintiff was not cooperative with the missing cash investigation and was disruptive with the

investigation and her team. Doc. 46-3 at 15 (Teague Dep. at 111:9-13). Specifically, Ms.

Teague's concerns were that Plaintiff was discussing the investigation with her subordinates

rather than referring them to HR. *Id.* (Teague Dep. at 111:17-22). In addition, Ms. Teague

testified that Plaintiff "appeared to be angry and, I think, creating an environment that was

difficult for the employees to participate in the investigation the way that – that an employee

---

[4] The memorandum does not explain who Mr. Woodyard is or what questions Plaintiff asked him.

should be able to do that." *Id.* at 15-16 (Teague Dep. at 113:20-114:2).[5] Ms. Teague based her opinion on communications she received from Annie Haskins. *Id.* at 16 (Teague Dep. at 114:16-115:7).

       E.      <u>The Level-Three Written Corrective Action</u>

      After seven weeks on administrative leave, Ms. Garcia asked Plaintiff to attend a meeting on August 17, 2016. Compl. ¶ 49; Answer ¶ 49. At that meeting, Plaintiff was given a "level three" disciplinary corrective action and a one-day suspension with pay. Doc. 46 at 10 ¶ 38; Doc. 46-6 at 1. The written corrective action indicated that Plaintiff failed to successfully manage her department. Doc. 46-6 at 1. It contended that "the processes for handling cash were without proper safeguards" and were "negligent." *Id.* Plaintiff was responsible for these failings because she had been "the manager over this department since 2009" and she "had a duty to properly manage [her] area." *Id.* In addition to the one-day paid suspension, Plaintiff was relieved of her position as a Manager of Customer Service Revenue and moved to a position of Manager of Meter Reading, at the same grade and salary. *Id.*

      Ms. Teague testified that she placed Plaintiff on Written Corrective Action Level III because Plaintiff displayed poor judgment and decision-making in her failure to demonstrate competent leadership to successfully manage her department. Doc. 38-2 at 7 (Teague. Dep. at 144:5-22). In particular, Plaintiff did not ensure proper safeguards of the handling of cash under her area of responsibility and inappropriately spoke to employees about the investigation. Doc. 38 at 8 ¶ 13; Doc. 46 at 4 ¶ 13.

      In comparison, Plaintiff points to transgressions by other employees which received less

---

[5] The parties dispute each other's characterizations of this testimony. Doc. 46 at 3 ¶ 12 & n.5; Doc. 47 at 2 ¶ 12. The Court describes the testimony rather than the parties' characterizations of the testimony.

severe (or no) punishment. Ms. Teague testified that, in one instance, Mr. Morgan

unintentionally sent text messages to another employee that were intended for his wife. He

received either a level one or level two discipline after the employee complained to HR. Doc. 46-

3 at 20 (Teague Dep. at 139:19-141:3).[6] In another instance, a field collector was accused of

harassing a female customer and agreeing to hook up her power if she performed sexual favors.

*Id.* (Teague Dep. at 141:4-12). Defendant was not able to substantiate the complaint because the

customer who complained would not talk about it. *Id.* (Teague Dep. at 141:16-21). Plaintiff

thought that Defendant's investigation was inadequate because the customer in question was

Native American and she was only willing to speak to a PNM Native American spokesperson,

but Ms. Garcia refused to accommodate that request. Doc. 46-1 at 41 (Plf. Dep. at 98:2-18).

        F.      Plaintiff's Termination

        Part of the level-three corrective action required Plaintiff to submit an action plan

addressing the steps she would take to ensure her improvement and accountability. Doc. 46-6 at

1-2. The written action warned Plaintiff that a failure to submit a suitable action plan would be

considered a resignation. *Id.* at 2. Plaintiff submitted an action plan that indicated she was not

aware that her behavior needed improvement and, therefore, she was unsure what she needed to

do to improve. Doc. 46-3 at 17 (Teague Dep. at 126:1-7). Ms. Teague held a meeting with

Plaintiff regarding Plaintiff's demeanor and gave her another chance to submit a written plan. *Id.*

(Teague Dep. at 126:8-127:4). In the second action plan submitted on August 22, 2016, Plaintiff

repeated the language from the level-three written corrective action memorandum. *Id.* (Teague

Dep. at 127:10-13). Ms. Teague took some time to think about it and decided that merely

---

[6] The record does not indicate at what point in the more than 25 years that Mr. Morgan has worked for Defendant this incident happened.

parroting the language from the written corrective action was not an acceptable plan. *Id.* at 18 (Teague Dep. at 131:23-132:7). Ms. Teague informed Plaintiff on an August 24 phone call that she was accepting Plaintiff's resignation.[7] *Id.* at 19 (Teague Dep. at 136:11-19).

Plaintiff believes that Defendant terminated her employment because she complained about Ms. Garcia and because of her "persistence" on the pay issue. Doc. 38 at 8 ¶ 11; Doc. 46 at 3 ¶ 11. By contrast, Ms. Teague testified that Plaintiff's employment was terminated because Plaintiff failed to provide a suitable action plan that would adequately address the issues identified in the written discipline, and because her comments in the meetings to discuss the action plans demonstrated that Plaintiff was not sincere in wanting to improve her performance. Doc. 38 at 8 ¶ 14; Doc. 46 at 4 ¶ 14.

G.    Procedural History

Plaintiff filed this suit in federal court on November 26, 2018. Doc. 1. Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 11, 13, 14. Judge Fashing assigned the case to a 150-day discovery track. Doc. 18. After the parties conducted discovery, Defendant filed the present motion for summary judgment in accordance with the deadline in the scheduling order. Doc. 38. Plaintiff filed a response in opposition on October 18, 2019, and Defendant filed a reply on November 8. Docs. 46 & 47. The Court held a hearing on the motion on March 3, 2020. *See* Clerk's Minutes (Doc. 53) & Hearing Transcript ("Tr.") (Doc. 54). Briefing is complete and the motion is ready for decision.

---

[7] Defendant's policy is to refer to Plaintiff's termination as a resignation, but Ms. Teague could not explain why this is so. Doc. 46-3 at 17 (Teague Dep. at 136:23-37:1). In its motion for summary judgment, Defendant does not dispute that Plaintiff's resignation was involuntary. Doc. 38 at 18 n.4. The Court therefore refers to it as a termination.

H.     <u>Evidentiary Disputes</u>

The "undisputed facts" the parties have submitted in their briefs have given rise to three evidentiary disputes the Court must address before it turns to the parties' arguments. First, Plaintiff challenges Defendant's reliance on a declaration from Angela Pino regarding the three managers' salary disparities and Defendant's contention that Ms. Teague placed Plaintiff on administrative leave because she was disruptive with the missing-cash investigation. Second, Defendant objects on grounds of hearsay to Plaintiff's contention that Ms. Teague said she "did not like" Plaintiff. Third, Defendant challenges Plaintiff's characterization of her coworker's statements that Ms. Teague and Ms. Garcia were forcing him to frame Plaintiff for the missing cash.

The same legal rubric applies to each of these contentions. "At the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (internal quotation marks omitted). "That is, Rule 56 permits parties at summary judgment to produce their evidence by means of affidavit, a *form* of evidence that is usually inadmissible at trial given our adversarial system's preference for live testimony." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010). "Nonetheless, the content or substance of the evidence must be admissible." *Argo*, 452 F.3d at 1199. "So it is that, although evidence presented in the form of an affidavit at summary judgment can be 'converted' in form into live testimony at trial, the content or substance of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration." *Johnson*, 594 F.3d at 1210; *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) ("In particular, at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form.").

11

The first dispute is Plaintiff's challenge to the declaration of Angela Pino, PNM's Human Resource Manager. Doc. 38-1 at 18-21. Plaintiff asserts that Ms. Pino lacks personal knowledge of the facts she asserts. Doc. 46 at 3 n.3 & 13 n.8. Ms. Pino provides the basis of her knowledge in her affidavit. She declares that she is responsible for compensation at PNM and has approximately 16 years of experience in the compensation department. Doc. 38-1 at 18 ¶ 2. She further states that the compensation department is responsible for classifying most positions in the company and working with managers to evaluate employees' compensation. *Id.* ¶ 3. "Among the more important factors PNM's compensation department considers when determining appropriate compensation for a management position is the span or scope of a manager's control, the nature of the people and work that the manager supervises, and market factors outside of PNM." *Id.* at 19 ¶ 8. "Just because two jobs are classified within the same grade does not mean that those jobs are the same or 'substantially similar' such that the compensation for those jobs should be identical. Even within a grade, compensation for particular positions can and does vary based on a variety of factors unrelated to any legally protected characteristic like sex or race, etc." *Id.* ¶ 9 (emphasis removed).

Specifically addressing Plaintiff's allegations, Ms. Pino asserts that she "analyzed the positions that Plaintiff, Mr. Morgan, and Mr. Cervantes held during the time Plaintiff was a manager at PNM." *Id.* at 20 ¶ 13. She opines that "Ms. Talbott's allegations that they all held equivalent or substantially similar positions warranting either identical compensation or higher compensation for Ms. Talbott are inaccurate." *Id.* "The compensation of Ms. Talbott, Mr. Morgan, and Mr. Cervantes differed because of different jobs and management responsibilities they each had as well as their history of performance-based merit increases." *Id.* ¶ 16.

Plaintiff argues, however, that the Court should reject these opinions because Ms. Pino has no personal knowledge of the matters on which she opines. Doc. 46 at 3 n.3 & 13 n.8. Plaintiff asserts that Ms. Pino "was never responsible for promoting senior level managers who reported to Ms. Teague or her predecessors, determining their salaries, or determining merit increases." *Id*. The Tenth Circuit precedent agrees with Plaintiff that "an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to." *Argo*, 924 F.2d at 1200. But the fact that Ms. Pino was not the decisionmaker regarding pay rates does not mean that she lacks personal knowledge as to why the salaries are what they are. Ms. Pino attests, under penalty of perjury, that she has personal knowledge of the matter because she herself analyzed each of the three salaries, compensation history, and the jobs performed. Doc. 38-1 at 18-21. As the Tenth Circuit noted in *Argo*, this distinction matters. 452 F.3d at 1200 (affidavit not admissible because the affiant, "[a]s a co-worker, and not a human resources official . . . simply was not in a position to acquire such comprehensive knowledge"). Here, Ms. Pino is not only a human resources official, but *the* human resources official responsible for compensation at PNM. As such, she has personal knowledge of the matters contained in her affidavit. Because Plaintiff identifies no other basis to exclude this evidence, the Court finds the affidavit admissible. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1123-24 (10th Cir. 2005) (permitting similar affidavit).

Second, Plaintiff takes issue with Defendant's reliance on Ms. Teague's testimony that Plaintiff was "not cooperative with the investigation" and that this was why she placed Plaintiff on administrative leave. Doc. 46 at 3 n.5. Plaintiff argues that Ms. Teague's testimony is "based solely upon inadmissible hearsay by employee, Annie Haskins." *Id.* Specifically, Ms. Teague testified that she did not personally observe Plaintiff being disruptive, but that she developed the

opinion that Plaintiff was being disruptive based on statements by Ms. Haskins. Doc. 46-3 at 16 (Teague Dep. at 114:3-116:7).

To the extent Defendant offers this testimony to explain Ms. Teague's motive for taking the action she took, the relevant question is whether Ms. Teague *believed* Plaintiff "was not cooperative with the investigation," not whether Plaintiff *actually* "was not cooperative with the investigation." In this circumstance, the statement does not constitute hearsay because Defendant is not using it for the truth of the matter, but rather for the effect on the listener. Thus, Defendant may use this statement in support of its contention that Ms. Teague acted as she did because she believed Plaintiff was being disruptive. *E.g.*, Doc. 38 at 19.

Defendant also makes evidentiary challenges. First, Defendant argues that Ms. Teague's alleged comment that she "did not like" Plaintiff, Doc. 46 at 9 ¶ 32, is based on inadmissible hearsay. Doc. 47 at 4-5 ¶ 32 ("Plaintiff (speaker one) testified that Eric Morgan (speaker two) told Plaintiff that JoAnn Garcia (speaker three) told Eric Morgan that Rebecca Teague (speaker four) told JoAnn Garcia that she (Ms. Teague) did not like Plaintiff . . . ."). There are three potential levels of hearsay involved in this story. If any of the levels of hearsay is inadmissible, Plaintiff cannot use it to oppose Defendant's summary judgment motion. *See Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1249 (10th Cir. 2013) (hearsay testimony in deposition cannot be used in opposition to summary judgment motion). In order to show that this testimony would be admissible at trial, Plaintiff must establish, for each level, that the out-of-court statement either does not constitute hearsay or falls within a hearsay exception. *Johnson*, 594 F.3d at 1208-09.

Plaintiff might be able to successfully cut through some of these layers of potential hearsay by arguing that statements a party makes against its interest are not hearsay at all. Under

Tenth Circuit precedent, an employee's statements may be admissible against his or her employer as a party-opponent admission in an employment dispute, if the employee was "involved in the decision-making process affecting the employment action at issue." *Johnson*, 594 F.3d at 1208-09. It is not disputed that Ms. Teague was involved in the decision-making process affecting Plaintiff's employment and so, barring any other hearsay concerns, what she said would be admissible as a statement against a party opponent. *See* Doc. 38 at 8 ¶¶ 12-14. The parties dispute the extent of Ms. Garcia's involvement, Doc. 38 at 10 ¶¶ 21-22; Doc. 46 at 4 ¶¶ 21-22, and so whether Ms. Garcia was involved in the decision-making process affecting Plaintiff's employment is less clear. The Court, however, need not determine whether Ms. Garcia's statement is admissible because, even if it were, Mr. Morgan's statement is not. Plaintiff presents no facts permitting an inference that Mr. Morgan had decision-making authority related to Plaintiff's employment. Because the statement Plaintiff seeks to introduce as evidence is in part based on hearsay from Mr. Morgan, the statement is inadmissible and the Court will not consider it for purposes of summary judgment.[8]

Defendant also challenges Plaintiff's statement in her additional material facts that Mr. Marentes told Plaintiff that he was "being forced by Ms. Teague and Ms. Garcia to develop facts against Plaintiff consistent with their predetermined conclusions." Doc. 46 at 9 ¶ 35; Doc. 47 at 5 ¶ 35. Defendant argues that the cited passages from Plaintiff's deposition do not support this allegation. Doc. 47 at 5.[9] The relevant deposition testimony is as follows:

---

[8] Although the Court excludes this statement, it also notes that, even if admitted, the statement would have little value. Plaintiff presents no evidence that Ms. Teague disliked her because she is a woman. Not liking a subordinate for a non-discriminatory reason is not actionable.

[9] Defendant does not argue that Plaintiff's statement about what Mr. Marentes said is inadmissible hearsay. Because Defendant does not make this argument and because the Court agrees that, even drawing all reasonable inferences in favor of Plaintiff, her actual deposition

Q. And how did you end up speaking to Jim Marentes about the investigation?

A. Jim asked me if he could buy me a cup of coffee and talk to me. I said yes. So we went downstairs. There's a little cafeteria area. We sat down. He said that he was very uncomfortable about some of the things he was being asked to do. He was my direct report so he should come to me. He told me that he felt like he was being forced or led into a certain direction as opposed to just being asked for the facts. He said he had pleaded with JoAnne [Garcia] to not question or accuse Dominique [Trujillo] of some of the things that they were wanting to ask her, because he had not been able to prove or disprove anything regarding the money, and that he just wanted more time. And he said that he was very uncomfortable and he didn't want to continue assisting.

Doc. 46-1 at 50-51 (Plf. Dep. at 110:9-111:1).

The Court agrees with Defendant that Plaintiff did not testify that Mr. Marentes was being forced to develop facts *against Plaintiff*. Instead, to the extent this testimony indicates that anyone was an unfair target of the investigation, that unfair target was Dominique Trujillo. At the motion hearing, Plaintiff could not cite any additional evidence in the record that supports the contention in her brief that Mr. Marentes was being forced to develop facts against Plaintiff that were consistent with Defendant's predetermined conclusions. Hearing Tr. at 38:18-41:10 & 63:21-25. As a result, the Court declines to consider this contention as a fact for purposes of summary judgment.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on

testimony does not support the interpretation of it in her response brief, the Court does not address the hearsay issue.

each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted).

Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* But, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. When "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is "entitled to a judgment as a matter of law." *Id.* at 323. Therefore, "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The movant may show an entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

### III.    DISCUSSION

A.    Defendant Is Entitled To Summary Judgment On The Equal Pay Act Claim.

1.    Plaintiff Has Not Presented Evidence That She And The Two Male Managers Were Performing Equal Work.

The Equal Pay Act ("EPA") forbids employers from engaging in wage discrimination between employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d). "EPA claims proceed in two steps." *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006). "First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work." *Id.* Second, if a prima facie case is established, the burden shifts to the defendant of persuading the jury that one of the permissible reasons under the EPA justify the wage disparity.[10] *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993).

"To establish a *prima facie* case under the EPA, [the plaintiff] has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997) (internal quotation marks omitted). The Tenth Circuit does "not construe the 'equal work' requirement of the EPA broadly, and [it has] stated that failure to furnish equal pay

---

[10] "These reasons are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex." *Mickelson*, 460 F.3d at 1311 (internal quotation marks omitted); 29 U.S.C. § 206(d)(i)-(iv).

for 'comparable work' or 'like jobs' is not actionable." *Id.* "It is not sufficient that some aspects of the two jobs were the same." *Nulf v. Int'l Paper Co.*, 656 F.2d 553, 560 (10th Cir. 1981).[11]

The parties' respective arguments focus only on whether Plaintiff was performing equal work as Mr. Morgan and Mr. Cervantes. The arguments rely on two major cases from the Tenth Circuit discussing the EPA. In the first, *Sprague v. Thorn Americas, Inc.*, the Tenth Circuit found that the plaintiff's job was not equal to that of male assistant managers because (1) the plaintiff was not an assistant manager and no assistant manager position existed in her department; she merely performed "some" functions of an assistant manager; (2) the plaintiff's department produced less than one-tenth of the revenues of the departments managed by the male assistant managers; (3) the plaintiff did not have a similar level of experience as the male assistant managers; and (4) the plaintiff received a poor performance review and a recommendation that she eventually be "let go." 129 F.3d 1355, 1364-65 (10th Cir. 1997). "At most, Sprague's job functions were merely comparable to those of the assistant managers." *Id.* at 1365.

By contrast, in the second case, *Riser v. QEP Energy*, the Tenth Circuit found genuine issues of material fact existed with respect to the plaintiff's Equal Pay Act claim. 776 F.3d 1191, 1196-97 (10th Cir. 2015). The defendant employer in *Riser* split the female plaintiff's job into two separate positions, hired a male to take one of these positions (who the plaintiff then trained), fired the plaintiff, replaced her with a male who assumed plaintiff's remaining duties,

---

[11] This test is an objective one, rather than a subjective inquiry into what Plaintiff believes about her work. *Cf. Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir. 2000) (plaintiff's subjective opinion as to his performance compared to others does not raise a fact question on a wage discrimination claim). In Count III of her Complaint, Plaintiff complains that she "was paid a lower wage than male employees doing substantially similar work" and so has properly pled that she received less pay for the same work. Doc. 1 ¶ 68. Therefore, the Court declines to adopt Defendant's theory that Plaintiff is foreclosed from raising an equal pay claim due to her own opinion that Defendant should have paid her *more* than the male managers. Doc. 38 at 13-14.

and paid each male more than it had paid the plaintiff when she was doing both jobs. *Id*. at 1194-95. With regard to the first male hired, Mr. Chinn, "there were no tasks on Mr. Chinn's job description that Ms. Riser was not previously responsible for performing." *Id*. The fact that these duties were only a third of the plaintiff's work, and constituted 100% of Mr. Chinn's work, did not preclude the plaintiff's claim. *Id*. at 1196-97. The employer did not "present[] evidence that the additional time Mr. Chinn spent on [these duties] necessarily meant he performed more work." *Id*. at 1197. Instead, "a reasonable trier of fact might conclude that [the plaintiff] was simply more efficient" than Mr. Chinn at performing the same duties. *Id*.

With regard to the second employee, Mr. Bryant, the Tenth Circuit rejected four reasons the employer offered to explain why the work Mr. Bryant took over was not equal to the plaintiff's work. First, Mr. Bryant directly supervised one employee, while plaintiff had no direct reports but had supervisory responsibility over some employees. *Id*. Tenth Circuit found that Mr. Bryant's supervision of this one employee took up less than five percent of Mr. Bryant's time and so was not a substantial difference. Second, Mr. Bryant worked on a construction project (similar in nature to those the plaintiff had previously managed) after plaintiff was terminated. *Id*. But plaintiff had no opportunity to work on this project because the project began two months after the defendant terminated the plaintiff. *Id*. As a result, this work did not demonstrate that plaintiff's position was different than Mr. Bryant's. *Id*. at 1197-98. Third, although the plaintiff managed facilities at defendant's Salt Lake City office while Mr. Bryant managed facilities at defendant's Denver office, defendant provided no evidence "that these tasks required different amounts of skill, knowledge, or responsibility." *Id*. at 1198. Finally, defendant pointed to other duties that it claimed Mr. Bryant performed, but Mr. Bryant acknowledged his involvement in those duties was "slim to none." *Id*. They were therefore irrelevant to the equal pay inquiry. *Id*.

Like the plaintiffs in *Sprague* and *Riser*, the outcome of Plaintiff's prima facie case turns on whether her job responsibilities were substantially equal to those of her male comparators. In arguing that they were, Plaintiff focuses on elements of her former job that were similar to the work of Mr. Morgan and Mr. Cervantes.[12] Doc. 46 at 8 ¶¶ 23-24. But the fact that *some* of the work performed by Plaintiff matches the work performed by her male colleagues cannot establish her prima facie case if many features of this work remain substantially different. And significant features of the jobs Mr. Morgan and Mr. Cervantes performed were substantially different than the job Plaintiff performed.

While Plaintiff and Mr. Morgan both managed payment centers, Plaintiff managed the Albuquerque payment center and Mr. Morgan managed payment centers for the rest of the state. Plaintiff's area of responsibility involved a much smaller geographic area and a smaller number of employees (30 compared to 100). That Mr. Morgan managed a larger area with more employees indicates that his position involved more supervisory responsibility than Plaintiff's. *See Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 700 (7th Cir. 2003) ("[I]t is reasonable to conclude that [the male comparator]'s management of a department twice the size of [the plaintiff]'s is indicative of greater responsibility."). In addition, the undisputed facts demonstrate that Mr. Morgan managed the statewide meter reading group at PNM. Doc. 38 at 7 ¶ 3; Doc. 46 at 2 ¶ 3. While employed by Defendant, Plaintiff never managed meter reading. Doc. 38 at 7 ¶ 5; Doc. 46 at 2 ¶ 5. At the summary judgment hearing, Plaintiff conceded that there are no facts in the record that establish how much of Mr. Morgan's job involved managing

---

[12] At the summary judgment hearing, Plaintiff focused on the similarities between Mr. Morgan's job and Plaintiff's job rather than on the similarities between Mr. Cervantes' job and Plaintiff's job. Because Mr. Cervantes' job is more clearly distinguishable from the job of Plaintiff, the Court does the same. *E.g.*, Hearing Tr. at 28:6-8 & 31:3-5.

meter-reading versus rural payment centers. Hearing Tr. at 27:25-28:2 & 33:23-34:7. She also concluded that the facts demonstrate that Mr. Morgan and Ms. Talbot have different responsibilities, and that the Court cannot equate the two jobs on the current record. *Id.* at 29:6-13.

The plaintiff bears the burden of presenting facts to establish her prima facie equal pay case. *Sprague*, 129 F.3d at 1364; *Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 824 (10th Cir. 2010) (unpublished). At the hearing, Plaintiff contended that the absence of evidence on an issue creates a genuine issue of fact which the jury must resolve. Hearing Tr. at 27:25-28:5, 29:11, 34:2-9 & 34:17-25. This is incorrect. Because Plaintiff bears the burden of proof on this element at trial, Defendant demonstrates an entitlement to summary judgment simply by pointing to the absence of evidence on this claim. *Celotex Corp.*, 477 U.S. at 322-23; *Adler*, 144 F.3d at 671. Although the Court must draw all factual inferences in favor of Plaintiff, the non-moving party, the Court cannot draw inferences in the absence of facts.

Plaintiff similarly fails to meet her burden to show that her job responsibilities were similar to those of Mr. Cervantes. True, Plaintiff and Mr. Cervantes shared responsibility for following up with customers on delinquent accounts. But even these responsibilities were not equal: Mr. Cervantes only managed this task if a delinquent customer contacted the call center. Doc. 46-1 at 22-23 (Plf.'s Dep. at 49:20-50:3). There is no evidence as to the numbers and complexity of the delinquent accounts Mr. Cervantes managed compared to Plaintiff's department.[13] And, in addition to that responsibility, Mr. Cervantes managed Defendant's entire

---

[13] It is possible that Plaintiff's responsibilities in this respect were *greater* than Mr. Cervantes' responsibilities, a fact which would weigh in her favor. *Riser*, 776 F.3d at 1197 ("'Differences in skill, effort or responsibility do not justify a finding that two jobs are not equal under the EPA where the greater skill, effort, or responsibility is required of the lower paid sex.'" (quoting 29

22

call center and was responsible for everything related to the call center, including the three or four supervisors who managed the call center representatives. He also managed an escalation desk for customer issues that could not be resolved at the call center and managed the analyst in charge of call center scheduling. By contrast, Plaintiff never managed Defendant's call center, and once again, she presents the Court with no facts that would permit it to evaluate what, if anything, in Plaintiff's duties was equal to managing a call center.

The Court acknowledges that Plaintiff had job responsibilities that her comparators did not have, and that her position may well have involved a substantial amount of difficulty and responsibility. She oversaw five departments. She had sole management responsibility for the credit and collections team, billing and exceptions, the Albuquerque payment center, skip tracing, and remittance reconciliation for customer payments. But Plaintiff offers no facts to enable the Court to compare this work with Mr. Morgan's meter-reading work and Mr. Cervantes' call-center work. Her prima facie case must involve something more than showing that she managed sub-departments in PNM and so did the males. The only quantitative evidence in the record presented for all three managers—the number of supervisors working under each—demonstrates that Plaintiff managed fewer (2 supervisors) than Mr. Morgan (5 or 6 supervisors) or Mr. Cervantes (3 or 4 supervisors). She presents no facts that would allow the Court to compare the skills, duties, or effort required to manage her department versus the call center and the meter reading departments.

Instead, she offers four general contentions in support of her prima facie case: the three managers "[1] all reported to Ms. Teague, [2] supervised a varying number of other employees,

C.F.R. § 1620.14(a)) (alterations omitted)). But again, the record does not contain this information and a party cannot avoid summary judgment by resting on speculation.

[3] oversaw sub-departments, and [4] were classified . . . senior-level management." Doc. 46 at 13. Each of these contentions is misplaced. First, the fact that the three managers reported to the same person indicates nothing about the skill, effort, responsibility, and duties required of each position. A simple hypothetical illustrates this point: suppose a senior attorney at a law firm manages junior attorneys as well as the staff who answers phones. Both jobs have value to the organization, but responsibilities associated with each position are not substantially similar. In other words, the existence of a common supervisor does not establish that all positions under that supervisor have job responsibilities that are substantially equal.

Second, Plaintiff again fails to carry her burden of proof with respect to the "varying" numbers of other employees each manager supervised. She presents evidence that Plaintiff was responsible for approximately thirty employees. Doc. 46 at 10 ¶ 18. But Mr. Morgan was responsible for approximately one hundred employees. Doc. 46 at 7 ¶ 20. Clearly, this fact works against, not for, Plaintiff. If Mr. Morgan supervised *more* employees than she did, their work was likely not equal.[14] Again, this failure to present evidence on an issue where she carries the burden of proof entitles Defendant to summary judgment.

Third, as described above, the "sub-departments" that each manager oversaw are not identical in size or tasks, and Plaintiff has no evidence that they are otherwise equal. And finally, Plaintiff herself recognizes that the manner in which Defendant chooses to classify a position has no bearing on whether the work is *in fact* equal in skill, effort, responsibility, and duties. Doc. 46 at 3 n.2 ("the determination whether work is substantially equal 'turns on the actual content of

---

[14] At the hearing, Plaintiff stated that Mr. Cervantes was not responsible for any employees. Hearing Tr. at 29:14-18. But this "fact" is not in her response brief and she never provided a record citation for it. In the absence of admissible evidence in the record, the Court makes no inferences on this point with regard to Mr. Cervantes.

the job—not mere job descriptions or titles.'"); *id.* at 13 ("Not only are titles and descriptions irrelevant to *job content* . . . ." (emphasis in original)).

The Court reaches its conclusion based on facts in Defendant's memorandum that Plaintiff did not dispute, as well as Plaintiff's own statement of additional facts (Doc. 38 at 7 ¶¶ 3, 4, 5, the substance of which is not disputed in Doc. 46 at 2 ¶¶ 3, 4, 5; and Plaintiff's Statement of Material Facts in Doc. 46 at 7-8 ¶¶ 18, 19, 20, 21, 23). But in addition to these facts, Defendant submits the declaration of Angela Pino in Defendant's HR department, which the Court found to be admissible. Doc. 38-1 at 18-21. In response to Plaintiff's allegations, Ms. Pino "analyzed the positions that Ms. Talbott, Mr. Morgan, and Mr. Cervantes held during the time Ms. Talbott was a manager at PNM." *Id.* at 20 ¶ 13. "Ms. Talbott's allegations that they all held equivalent or substantially similar positions warranting either identical compensation or higher compensation for Ms. Talbott are inaccurate." *Id.* "The compensation of Ms. Talbott, Mr. Morgan, and Mr. Cervantes differed because of different jobs and management responsibilities they each had as well as their history of performance-based merit increases." *Id.* ¶ 16. Although the Court independently determined, based on the facts in the record, that Plaintiff did not show that the three managers were performing equal work, the Court accepts Ms. Pino's affidavit as admissible evidence that further confirms this conclusion. The Court therefore grants summary judgment in Defendant's favor on Ms. Talbot's equal pay claim.

> 2.      Plaintiff Has No Evidence The Alleged EPA Violation Was Willful.

Even if the Court were to conclude that a reasonable jury could find that Plaintiff's position involved work equal to the two male managers' positions, Defendant argues that her claim would be barred by the applicable statute of limitations. Doc. 38 at 22. The statute of limitations for the EPA is two years for non-willful violations and three years for willful violations. 29 U.S.C. § 255(a); *see Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266,

1270 (10th Cir. 2011). It is undisputed that Defendant terminated Plaintiff on August 24, 2016.

Plaintiff then filed this lawsuit on November 26, 2018, more than two years after the date of her

last allegedly unequal paycheck. Therefore, "[t]o fall under the three-year limitation, the plaintiff

must show that 'the employer either knew or showed reckless disregard for the matter of whether

its conduct violated the statute.'" *Mumby*, 636 F.3d at 1270 (quoting *McLaughlin v. Richland

Shoe Co.*, 486 U.S. 128, 133 (1988)). "Reckless disregard can be shown through 'action entailing

an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"

*Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)). "The court's operative

inquiry focuses on the employer's diligence in the face of a statutory obligation, not on the

employer's mere knowledge of relevant law." *Id.* Plaintiff has the burden of persuasion to show

willfulness. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

Plaintiff argues that a reasonable jury could find willfulness because she "brought her

unequal pay to PNM's attention through three different Directors within the Customer

Experience department, and that each time her requests were rejected without reason." Doc. 46 at

22. This argument—that a violation is willful as long as the employee complains to the employer

about her pay—is extremely similar to a standard the Supreme Court expressly rejected in

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). The Court explained that Congress did

not intend to enact a standard that merely requires the employee to show the employer was aware

of the Act and its potential applicability. *Id.* at 132-33. Such a standard was unworkable because

it "virtually obliterates any distinction between willful and nonwillful violations" and would

result in the Act applying "only to ignorant employers." *Id.* The Court further explained in a

footnote that "[i]f an employer acts reasonably in determining its legal obligation, its action

cannot be deemed willful." *Id.* at 135 n.13. Likewise, "[i]f an employer acts unreasonably, but

not recklessly, in determining its legal obligation, then . . . its action . . . should not be so

considered." *Id.* Thus, the Supreme Court affirmed the Third Circuit's holding that "respondent

had not committed a willful violation unless 'it knew or *showed reckless disregard for the matter*

*of whether* its conduct was prohibited by the FLSA.'" *Id.* at 130 (quoting *Brock v. Richland Shoe*

*Co.*, 799 F.2d 80, 82 (1986)) (emphasis in original).[15]

      Under this same logic, the Court rejects Plaintiff's argument that willfulness can be

shown merely by the fact that Plaintiff alleged to Defendant that her salary was unequal to those

of the male managers. Certainly, Defendant made a willful decision to pay Plaintiff less than Mr.

Morgan and Mr. Cervantes. But the adjective "willful" in the statute does not modify the

decision of what to pay; it modifies "violation." Therefore, a plaintiff must come up with some

evidence that a defendant willfully violated the statute by deciding to pay a female less because

of her gender, or recklessly disregarding an unjustifiably high risk that it had done so.

      Plaintiff argues that "Ms. Teague's eventual reclassification of Plaintiff's position to the

. . . grade of her male counterparts amounts to recognition that Plaintiff's claims had validity."

Doc. 46 at 22. This argument, however, is a double-edged sword. Defendant's review of

Plaintiff's salary and job position also indicates that Defendant was not reckless in its evaluation

of Plaintiff's complaints about unequal pay. It demonstrates that, rather than deliberately

blinding itself to the situation or choosing to discriminate, Defendant reviewed Plaintiff's work

and the work of the male managers to determine appropriate pay for each. In other words,

evidence that Defendant decided to give Plaintiff a raise after it investigated the jobs at issue is

---

[15] The relevant statute of limitations—section 255—applies to violations of the EPA, the Fair
Labor Standards Act ("FLSA"), the Davis-Bacon Act, the Walsh-Healey Act, and the Age
Discrimination in Employment Act ("ADEA"). *McLaughlin*, 486 U.S. at 131. Therefore,
although *McLaughlin* is about the FLSA, the Court looks to it for guidance regarding the
willfulness requirement in the EPA.

also evidence that Defendant "act[ed] reasonably in determining its legal obligation."

*McLaughlin*, 486 U.S. at 135 n.13.

Granted, although Defendant gave Plaintiff a raise and made her grade the same as the men she complained about, Defendant did not make her pay equal to theirs. But Plaintiff presents no direct evidence that Defendant chose to pay her less because she is a woman rather than because her job responsibilities were less. And, based on the analysis in the previous section, the undisputed differences in Plaintiff's job and the job of the men to whom she compares herself foreclose a finding of willfulness based on indirect evidence.

Because Plaintiff has not presented evidence of a willful violation, the statute of limitations bars her equal pay claim.

B.       Defendant Is Entitled To Summary Judgment On Plaintiff's Title VII Claims.

Plaintiff's claims of discrimination and retaliation under Title VII are subject to the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that framework, "the initial burden is on the employee to make a prima facie showing of discrimination by the employer." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1362 (10th Cir. 1997) (internal quotation marks omitted). Plaintiff's response to the motion for summary judgment sets forth three separate theories of liability under Title VII: retaliation (Doc. 46 at 6-18); discriminatory failure to promote (Doc. 46 at 12); and discriminatory wages (Doc. 46 at 13). The Court will address each in turn.

1.       Plaintiff Cannot Demonstrate The Prima Facie Elements Of A Retaliation Claim.

To state a prima facie case of retaliation, Plaintiff must show: "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the

protected activity and the materially adverse action." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (internal quotation marks and alteration omitted). Plaintiff has clearly established the first element of this test, as her complaints of unequal pay constitute protected activity. Doc. 46 at 16; *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984) ("The Act also applies to the unofficial assertion of rights through complaints at work.").

The two adverse actions Plaintiff alleges as part of her retaliation claim (Count II) are placing her on paid administrative leave and terminating her. Doc. 1 ¶ 61. As set forth below, Defendant's act of placing Plaintiff on paid administrative leave does not constitute an adverse action. Terminating her does.

Plaintiff asserts in her Complaint that, "on June 30, 2016, Ms. Talbott was placed on paid administrative leave by Defendant Teague and Mrs. Ortiz," Doc. 1 ¶ 47, and "[a]fter seven (7) weeks on administrative leave, Mrs. Talbott was contacted by Defendant Garcia and ordered to attend a meeting on August 17, 2016," *id.* ¶ 49. In alleging Title VII retaliation in Count II, Plaintiff then writes that, after submitting a complaint against Ms. Garcia, "Mrs. Talbot [sic] was placed on administrative leave and eventually terminated." *Id.* ¶ 61.

Plaintiff's administrative leave is logically divided into two parts. The first part consists of approximately seven weeks of paid administrative leave while Defendant conducted its investigation into the missing cash. *See supra*, Section I.D. The second part is the single day of paid administrative leave in connection with Defendant's written disciplinary action against Plaintiff. *See supra*, Section I.E. This distinction matters because, as set forth below, being placed on paid administrative leave pending an investigation does not constitute an adverse action while the Court does not consider whether being placed on paid administrative leave as part of a formal disciplinary action does. Plaintiff indisputably asserts in her Complaint that

Defendant retaliated against her when it placed her on seven weeks of paid administrative leave after she complained about Ms. Garcia. Nowhere in her Complaint, however, does Plaintiff assert that Defendant's written disciplinary action against her constituted retaliation. The Complaint's general reference to Plaintiff being placed on paid administrative leave in June after she complained about Ms. Garcia simply is not tantamount to claiming that Defendant retaliated against her in August when it took the separate action of placing her on one-day paid administrative leave as part of its written disciplinary action against her.

A close look at Plaintiff's allegations demonstrates that the administrative leave she references in her Complaint is the seven weeks of investigatory administrative leave, not the one day of disciplinary administrative leave. In paragraphs 47 and 49 of her Complaint, Plaintiff explicitly references the seven weeks of administrative leave that began on June 30, 2016. Similarly, when Plaintiff references administrative leave in Count 2 of her Complaint (paragraph 61), she refers to the administrative leave that began after she complained about Ms. Garcia, which is the same non-disciplinary administrative leave referenced in paragraphs 47 and 49. Further, in the retaliation section of her brief, Plaintiff argues "a rationale [sic] fact finder could find that Plaintiff *was investigated* and terminated because of her protected complaints of unequal pay." Doc. 46 at 16 (emphasis added). Thus, the Court views Plaintiff as asserting that Defendant retaliated against her when it placed her on administrative leave while it investigated the missing cash rather than asserting that Defendant retaliated against her by placing her on one day of paid disciplinary administrative leave.[16] Given this conclusion, the Court considers

---

[16] Plaintiff's only reference to "discipline" occurs in context with her pretext argument. She argues that a male counterpart received less discipline for a more egregious violation, which shows that Defendant's stated reasons for the alleged retaliatory actions it took against Plaintiff were pretextual. Doc. 46 at 17. Plaintiff did argue at the March 3, 2020 hearing, however, that

whether placing Plaintiff on seven weeks of paid administrative during which time Defendant investigated the missing cash constituted an adverse employment action.

The Tenth Circuit has never squarely decided the question of whether an investigation is an adverse action. In *Lincoln v. Maketa*, it strongly implied that the answer is no. 880 F.3d 533, 540 (10th Cir. 2018) ("A workplace investigation generally does not constitute an adverse employment action."). Ultimately, however, this case only held that such a principle is not clearly established law for purposes of qualified immunity. *Id.* at 540, 543. Thus, it provides limited guidance. In *Couch v. Board of Trustees of Memorial Hospital of Carbon County*, the Tenth Circuit explained that "context matters." 587 F.3d 1223, 1238-39 (10th Cir. 2009) (alteration omitted). It held that an investigation not directed solely at the plaintiff, but reasonably commenced against the plaintiff as well as another employee when they both complained about each other, was not an adverse action. *Id.* And in *Piercy v. Maketa*, the court recognized that an investigation that culminates in termination can be evidence of a retaliatory

---

Defendant's pre-termination discipline constituted retaliation. Specifically, when the Court asked Plaintiff about adverse actions other than termination, Plaintiff argued, "there is the corrective action plan of the one-day suspension, which would be considered an adverse action since it was -- she wasn't paid for a suspension of pay for one day. And also, there was the demotion, which did transfer job duties to another job. So that would have been considered an adverse action as well. And certainly, the corrective action plan level 3." Hearing Tr. at 47:22-48:8. Counsel later corrected her statement to acknowledge that the one-day suspension was with pay. More significantly, however, Plaintiff's presentation of this argument for the first time at oral argument on Defendant's motion for summary judgment is too late.

The Court would not be inclined to grant a request to amend the Complaint at this late juncture, even had Plaintiff made such a request. The deadline to amend pleadings has passed, discovery has closed, and the motion for summary judgment is fully briefed. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238 (10th Cir. 2015) (discussing the district court's discretion to deny untimely requests to amend the complaint). Even if an amendment were permitted, the Court would find that Plaintiff has not stated a prima facie case with respect to the formal disciplinary action, for largely the same reasons discussed regarding Plaintiff's termination. *See infra*, pp. 33-35.

motive. 480 F.3d 1192, 1199-20 (10th Cir. 2007). But it explicitly did not decide whether the investigation, standing on its own, constituted an adverse action. *Id.* at 1199 n.5.

In the context of this case, the Court finds that the missing-cash investigation, in itself, cannot constitute an adverse employment action. Plaintiff does not dispute that cash went missing in her department immediately prior to the investigation being launched. And, although Defendant placed Plaintiff on administrative leave for allegedly interfering with the investigation, to the extent anyone was the target of the investigation, Plaintiff herself acknowledged that this person was Dominique Trujillo (rather than Plaintiff). Doc. 46-1 at 50-51 (Plf. Dep. at 110:9-111:1); Doc. 46 at 9 ¶ 33; Hearing Tr. at 40:20-23.

Like the question of whether an investigation is materially adverse, the Tenth Circuit has never issued a published opinion determining whether paid administrative leave is an adverse action. *Lincoln*, 880 F.3d at 542. An unpublished decision held (but with little analysis) that an eighteen-day suspension pending the outcome of an investigation is not an adverse employment action. *Juarez v. Utah*, 263 F. App'x 726, 736-37 (10th Cir. 2008) (unpublished). In addition, the Tenth Circuit noted that other circuits have held that paid leave is not materially adverse. *Lincoln*, 880 F.3d at 542 (citing *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009); and *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007)). The Court finds additional support for this conclusion in a separate opinion in which the Tenth Circuit held that an action which "offered no differences in pay and benefits" and did not involve work that was "more arduous" failed the test of materiality. *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006). Applying the same reasoning here, the investigatory administrative leave Defendant imposed on Plaintiff also fails the materiality test. Plaintiff does not offer any facts showing that Defendant altered her pay or benefits during the administrative leave. Nor does

Plaintiff argue that Defendant presented her with "more arduous" circumstances. Under these circumstances, the Court concludes that the neither the investigation nor the seven weeks of administrative leave constitute an adverse action.

In contrast to the missing cash investigation and the placing of Plaintiff on administrative leave after she complained about Ms. Garcia, terminating Plaintiff indisputably constitutes an adverse employment action. Although Plaintiff's retaliatory termination claim meets the first and second prong of the prima facie test, however, it fails at the third prong because Plaintiff has not sufficiently established a causal connection between her complaints of equal pay and her termination.

In reaching this conclusion, the Court first addresses the significance of the temporal proximity between Plaintiff's equal pay complaints in "early 2016" and her termination in August 2016.[17] As both parties recognize, causation may be inferred if protected activity is closely followed by an adverse employment action. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016). A one-and-a-half-month period between the protected activity and the allegedly retaliatory action will support such an inference, but a three-month gap will not. *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013). "However, where along the temporal line beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid." *Id.* The six to seven-month gap between Plaintiff's equal pay complaint and her termination, therefore, is too great to alone establish a causal connection.

---

[17] Although Plaintiff was unable to provide the exact date in early 2016 when she complained about her pay, she indicated at the hearing that this would have been in January or February. Hearing Tr. at 37:2-5.

In addition, "evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011). Plaintiff acknowledged at the hearing that the investigation was launched after the discovery of the missing cash, rather than directly after her complaints of unequal pay. Hearing Tr. at 36:8-37:5. Thus, the discovery of the missing cash is an intervening event between Plaintiff's complaints of unequal pay and her later termination.

Even if there were a temporal connection between Plaintiff's equal pay complaint and her termination with no intervening cause, however, Plaintiff's claim fails if Defendant also had a non-discriminatory motive for terminating her employment. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see* Doc. 38 at 16 ("[A] plaintiff asserting a statutory retaliation claim is required to prove 'but for causation' – that is, if not for her protected activity, she would not have suffered the materially adverse action."). In *Nassar*, the Supreme Court eliminated the mixed-motives approach to retaliation claims. 570 U.S. at 362. A "mixed motives" case is one in which the employer was "motivated by both legitimate and illegitimate factors." *Id.* at 370 (Ginsberg, J., dissenting). In this case, Plaintiff acknowledges that she is bringing a "mixed-motives" case. Her theory is that she was placed on administrative leave and ultimately terminated, in part because of her complaints about unequal pay and in part because of her complaint to HR about Ms. Garcia's handling of the missing cash investigation. Doc. 38-1 at 16; Doc. 1 ¶¶ 60-61; Hearing Tr. at 48:9-49:12. But her complaints about Ms. Garcia pertained to allegations that Ms. Garcia was bullying Plaintiff's employees and gossiping about Plaintiff's department with other employees. Doc. 38-1 at 29 (Plf. Dep. at 115:1-13); *see also* Doc. 1 ¶¶ 39-

40. This is not protected opposition to discrimination under the Equal Pay Act or Title VII, 42

U.S.C. § 2000e-3(a). Therefore, the Court finds that, by conceding that Defendant acted in part

for reasons that are not unlawful, Plaintiff cannot show "but-for" causation.

　　　　Finally, Plaintiff's claims based on her termination fail for a third reason. Although

termination is an adverse action, Plaintiff did not exhaust any Title VII claims related to her

termination. Before bringing any claims under Title VII, a plaintiff must file a charge with the

Equal Employment Opportunity Commission ("EEOC") within 180 or 300 days of the "alleged

unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 104-05 (2002). Each discrete incident of discriminatory or retaliatory

treatment by an employer constitutes its own "unlawful employment practice" for which this

administrative remedy must be exhausted. *Morgan*, 536 U.S. at 110-13. Discrete acts are those

acts "such as termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114.

　　　　The Tenth Circuit has explained that, "[i]n *Morgan*, this rule applied to bar a plaintiff

from suing on claims for which no administrative remedy had been sought, when those incidents

occurred more than 300 days *prior* to the filing of plaintiff's EEO complaint." *Martinez v.*

*Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). "The rule is equally applicable, however, to

discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint." *Id.* at

1210-11. The *Martinez* plaintiff alleged two separate discrete acts: a September 2000 letter of

reprimand (resulting in a letter of warning and a fourteen-day suspension) and an April 2001

termination. *Id.* "Although the letter of warning and fourteen day suspension resulting from the

September 2000 reprimand is contained in the [EEOC] complaint, the April 2001 termination is

not." *Id.* at 1210 (citation omitted). "Nor is there an amended complaint." *Id.* Accordingly, the

35

Tenth Circuit held that the plaintiff had failed to exhaust administrative remedies with respect to

his April 2001 termination. *Id.* at 1211.

Here, the parties do not dispute that Plaintiff filed a timely administrative charge with the

EEOC on August 23, 2016. Doc. 38 at 9 ¶ 17; Doc. 46 at 4 ¶ 17; Doc. 38-2 at 11-12. Her charge

listed the dates the discrimination took place as January 1, 2015 through August 17, 2016. Doc.

38-2 at 11. Her narrative states:

> I began working for Defendant in September 1993, where I am currently a
> Manager of Customer Service Revenue. In early 2015, I voiced a concern to the
> Customer Service Director that although my responsibilities were equal to or
> greater than my three male pears, my position was 2 grades lower, even though I
> had the most seniority and experience. In September 2015, I was informed that I
> was being upgraded to the same pay grade as the 3 males; however, I was also
> informed that my pay would only increase slightly to below midpoint of my new
> pay grade and still 25% less than my male peers. I was told that equalizing my
> pay to my male peers could not be justified and no one was allowed to jump that
> high.
>
> On June 30, 2016, I was put on paid administrative leave pending an investigation
> that had been ongoing since April 2016 which concerned $7,000.00 of missing
> cash.
>
> Although I was never implicated, I was put on leave because my behavior was not
> allegedly supportive of the investigation. On August 17, 2016, I was placed on the
> highest level of corrective action, a paid decision day, even though I had never
> been reprimanded previously. I was also transferred to be Manager of Customer
> Service of Meter Reading and was not given the salary of the male manager who
> had been recently promoted.
>
> I believe I was discriminated and retaliated against due to my sex (female), in
> violation of Title VII of the Civil Rights Act of 1964, as well as the Equal Pay Act
> of 1963.

*Id.* at 11-12. Plaintiff was terminated the next day, on August 24, 2016.

Thus, like *Martinez*, the present case involves a suspension followed by a termination,

with an EEOC charge filed after the suspension but before the termination (and so referencing

only the suspension). *Martinez*, 347 F.3d at 1210-11. Plaintiff argues that *Martinez* is

distinguishable because the *Martinez* plaintiff was attempting to litigate a discrete act that

occurred a year after his charge was filed, whereas in this case the discrete act of termination occurred only one day after Plaintiff's charge was filed. Doc. 46 at 23-24. The Court agrees that the one-day difference between Plaintiff's administrative complaint and her termination yields a result much harsher here than that in *Martinez*. That application of binding precedent yields a harsh result, however, does not make the precedent any less binding. The *Martinez* holding contains no exception for discrete acts that occur shortly after rather than long after an EEOC charge; instead, it bars litigation of all subsequent unexhausted discrete acts except insofar as they provide context to properly exhausted claims. 347 F.3d at 1210-11. Although the Court agrees with Plaintiff that application of *Martinez* leads to a very harsh result, the Court also agrees with Defendant that *Martinez*'s holding squarely governs this case and mandates summary judgment in Defendant's favor on Plaintiff's unlawful termination claim.

Plaintiff also argues that her termination claim should be considered exhausted because a termination is within the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination. Doc. 46 at 24 (quoting *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018)). This argument, however, also cannot survive binding Tenth Circuit precedent. In *Eisenhour v. Weber County*, the Tenth Circuit considered this same argument and found that *Morgan* and *Martinez* collectively foreclosed it. 744 F.3d 1220, 1226-27 (10th Cir. 2014). These decisions bind this Court. Defendant is entitled to summary judgment in its favor on Plaintiff's unexhausted claim based on her termination.

2.   <u>Plaintiff Does Not State Any Failure-To-Promote Claims.</u>

In her response in opposition to the motion for summary judgment, Plaintiff argues that her Title VII claim is based in part on a failure-to-promote theory. Doc. 46 at 12-13. Plaintiff, however, did not bring a failure-to-promote Title VII claim in her Complaint. Doc. 1. Her only Title VII claims are based on unequal wages (Count I) and retaliation (Count II). Nor are there

any factual allegations supporting a claim that she was qualified for the April 2010 and June 2012 promotions but failed to receive them because of intentional gender discrimination. *See Sprague*, 129 F.3d at 1362 (listing the elements of a failure-to-promote claim). At the motion hearing, Plaintiff conceded that she is not bringing a failure-to-promote claim. Hearing Tr. at 50:18-24. The Court therefore declines to address Plaintiff's contention that Defendant is not entitled to summary judgment on such a claim, because it is not part of this lawsuit.

> 3. Plaintiff Has Not Satisfied Her Burden To Demonstrate That Her Wages Were Discriminatory.

Plaintiff's final Title VII theory is wage discrimination. Doc. 46 at 11-12. It is similar to her Equal Pay Act claim, but "the Equal Pay Act and Title VII provide distinct causes of action and do not require precisely the same standard of proof." *Sprague*, 129 F.3d at 1361. As a Title VII claim, it is subject to the *McDonnell Douglas* burden-shifting analysis. "A female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague*, 129 F.3d at 1363 (internal quotation marks omitted). "Once a *prima facie* case is established, the defendant must articulate a legitimate, non-discriminatory reason for the pay disparity." *Id.* (internal quotation marks omitted). "This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Id.* (some internal quotation marks omitted). Furthermore, the defendant need not "establish that the reason *actually* motivated the decision." *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006). "Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against her." *Sprague*, 129 F.3d at 1363. "That is, the plaintiff must show that a discriminatory reason more likely than not motivated the employer to pay her less." *Id.* (internal quotation marks and alterations omitted).

In *Sprague*, the Tenth Circuit explained that the Title VII "similarity" requirement is more relaxed than the "equal work" requirement of the EPA. *Id.* at 1362-63. Nonetheless, the *Sprague* court found that both the EPA claim and the Title VII claim in that case could not succeed for the same reason: the differences between the female plaintiff's job and her male comparators were more significant than the jobs' similarities. *Id.* at 1363-65. As discussed above, Plaintiff here did not meet her burden to demonstrate that the similarities between her job and her male comparators' jobs were a significant portion of each job. Under *Sprague*, that failure dooms both her EPA claim and her Title VII claim.

Even if Plaintiff had established a prima facie case, Defendant has satisfied the second step of the *McDonnell Douglas* test. To satisfy the "exceedingly light" burden of this second step, Defendant explains that "Plaintiff, Eric Morgan, and Mario Cervantes had different compensation from each other, and their compensation differed because of different jobs and management responsibilities as well as their respective history of performance-based merit increases." Doc. 38 at ¶ 7. As support for this contention, Defendant relies on a declaration submitted by Angela Pino in Defendant's HR department. *Id.* (citing Doc. 38-1 at 18-21). In response to Plaintiff's allegations, Ms. Pino "analyzed the positions that Ms. Talbott, Mr. Morgan, and Mr. Cervantes held during the time Ms. Talbott was a manager at PNM." Doc. 38-1 at 20 ¶ 13. "Ms. Talbott's allegations that they all held equivalent or substantially similar positions warranting either identical compensation or higher compensation for Ms. Talbott are inaccurate." *Id.* "The compensation of Ms. Talbott, Mr. Morgan, and Mr. Cervantes differed because of different jobs and management responsibilities they each had as well as their history of performance-based merit increases." *Id.* ¶ 16.

Plaintiff's response to the summary judgment motion makes no attempt to argue that this explanation is a pretext for gender discrimination. Instead, she contends that Ms. Pino's affidavit is not competent evidence on summary judgment. The Court addressed, and rejected, this argument above. *Supra*, pp. 12-13. Plaintiff's challenge to the evidence Defendant submits in support of its motion for summary judgment therefore fails. Defendant is entitled to summary judgment.[18]

C.    The Court Declines Supplemental Jurisdiction Over Plaintiff's State-Law Claims.

Defendant also moves for summary judgment on the claims against it under state law for discrimination, retaliation, unfair pay, and breach of contract. The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367. Nonetheless, the Court may decline supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Tenth Circuit has indicated that "[w]hen all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, --- F.3d ---, 2020 WL 1910439, at *6 (10th Cir. Apr. 20, 2020) (reversing a district court for failing to decline supplemental jurisdiction). Even where the parties have expended considerable effort in litigating the state-law claims in the federal forum, including conducting full discovery, it is appropriate to decline to exercise supplemental jurisdiction because that discovery can be used in state court. *Huntsinger v. Bd. of Dir. of E-470 Pub. Highway Auth.*, 35 F. App'x 749, 759-60 (10th Cir. 2002); *see, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1248

---

[18] Because it finds that Plaintiff failed to establish a prima facie case, the Court does not reach Plaintiff's arguments about the statute of limitations under Title VII. Doc. 46 at 20-21.

(10th Cir. 2011) (affirming a district court decision to decline supplemental jurisdiction after granting summary judgment on the federal claims). Accordingly, the Court declines supplemental jurisdiction over the claims arising under state law and dismisses them without prejudice.

**IV.    CONCLUSION**

Defendant's Motion for Summary Judgment is GRANTED as to the federal claims in Count I, Count II, and Count III of the Complaint.

The state-law claims in Count I, Count II, Count IV, and Count V of the Complaint are DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by consent